Donald A. RADO, Petitioner-Appellee,

v.

STATE OF CONNECTICUT et al.,
Respondents-Appellants.

No. 1113, Docket 78–2154.

United States Court of Appeals,
Second Circuit.

Argued May 2, 1979.

Decided Oct. 3, 1979.

David S. Golub, Silver, Golub & Sandak, P. C., Stamford, Conn., for petitioner-appellee.

Robert E. Beach, Jr., Asst. State's Atty., Wallingford, Conn., for respondents-appellants.

Before FRIENDLY and MULLIGAN, Circuit Judges, and GAGLIARDI, District Judge.*

GAGLIARDI, District Judge:

The State of Connecticut appeals from a judgment of the United States District Court for the District of Connecticut (Blumenfeld, J.) ordering the release of Donald A. Rado from custody unless the State elects to retry Rado within sixty days. In 1972, after trial by jury in the Connecticut Superior Court (Speziale, J.), Rado was convicted of the crimes of robbery in the first degree and conspiracy and was sentenced to a six to twelve year period of incarceration. The Connecticut Supreme Court affirmed the judgment of conviction. *State v. Rado*, 172 Conn. 74, 372 A.2d 159 (1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1977).[1] After a hearing, the Connecticut district court held, in an unreported memorandum decision, that Rado's conviction had been obtained in violation of his constitutional rights under the Confrontation Clause and the Due Process Clause. For the reasons which follow, we reverse.

## I. THE FACTS

The state charged that in July, 1972 Rado met with three other men, Sean Donnelly, Wayne Epprecht and Fred Hall, at his Waterbury, Connecticut home to plan the armed robbery of a jeweler's widow, who lived nearby. Rado was not accused of having actually committed the substantive offenses of burglary and robbery, but of selecting the victim, instructing the robbers how to proceed, and supplying them with walkie-talkies and a gun with which to perpetrate the crime. Donnelly, Epprecht and Hall pled guilty to various charges stemming from the robbery and were called upon to testify at Rado's trial in December 1972.

The trial lasted two weeks. The principal state witnesses were Donnelly and Epprecht, both of whom testified that on the evening of July 2, 1972, they met with Rado and Hall at Rado's home and discussed the proposed robbery. Rado pointed out the victim's house, which was directly opposite and clearly visible from the back porch of his own, and stated that money and jewelry could likely be found there. The following day, July 3, Hall drove Donnelly and Epprecht in his car to Rado's home. The four men conferred in the basement of the home, where Rado gave Epprecht a .32 caliber pistol and Hall gave Donnelly a .38 caliber

* The Honorable Lee P. Gagliardi, United States District Judge for the Southern District of New York, sitting by designation.

1. During the four-year pendency of his state appeal, Rado was free on a $75,000 property bond. In 1977 the Connecticut district court granted Rado's motion for bail on similar terms pending a final disposition of the case on the merits. *Rado v. Manson*, 435 F.Supp. 349 (D.Conn.1977).

pistol. Rado instructed Donnelly and Epprecht to use the pistols in the course of the robbery, gave Donnelly a walkie-talkie unit to carry with him during the crime and agreed to remain at home for its duration "in the event anything happened."

Donnelly and Epprecht further testified that Hall drove them to the victim's home and remained in his car. While carrying a pine bush in an attempt to conceal their identities, Donnelly and Epprecht forced their way into the house, struck and bound the victim, and ransacked the house, taking several items of jewelry. When surprised by a neighbor, Donnelly and Epprecht fled, dropping Rado's walkie-talkie unit in their haste, and were driven by Hall back to Rado's home where they changed their clothes and returned the pistols to Rado.

Attacking the credibility of these two witnesses, the defense uncovered some minor inconsistencies in their respective accounts of the events of July 3 (e. g., the precise time of day that they arrived at Rado's house, the manner in which they got there, and their activities earlier that day immediately prior to arrival). In addition, the defense sought to impeach Donnelly with prior inconsistent statements that he made to police concerning disposal of the guns used in the robbery and his admission that he had been using narcotics in July, 1972. Epprecht admitted perjuring himself concerning his prior contacts with the Waterbury area. On the basic details of the crime, however, Epprecht and Donnelly's respective accounts were mutually corroborative and remained unshaken.[2] Moreover, strong circumstantial evidence of Rado's guilt was adduced by the state. An employee of Radio Shack, an audio equipment store in Waterbury, testified that the walkie-talkie dropped by Donnelly and found near the scene of the crime had identical serial numbers to a walkie-talkie sold in June, 1962 to a person identifying himself as D. Rado, 47 Mildred Avenue, Waterbury, Connecticut (Rado's address). The pistol used by Epprecht during the robbery was found in a search of Rado's house.[3] Fearing that the jury might nonetheless have drawn unfavorable inferences from Hall's failure to testify, the state called Hall to the stand.

On November 28, 1978, several days prior to the commencement of Rado's trial, pursuant to a plea bargain, Hall agreed to plead guilty to a charge of conspiracy in a superseding information in exchange for the state's attorney's promises to enter a nolle prosequi on the substantive offenses of robbery and burglary contained in the original information and to recommend a sentence of two to four years. It was also agreed that Hall could be subpoenaed by either side at Rado's trial, that the jury would not be informed of Hall's guilty plea, and that the state's attorney would recommend a lesser sentence if Hall cooperated in Rado's prosecution. The state's attorney also agreed that he would not contest Hall's right to assert his privilege against self-incrimination if Hall was called to testify and if Hall elected to do so. The attorneys informed Judge Speziale, who later presided over Rado's trial, of the terms of the plea bargain, except for the state's agreement to honor Hall's possible assertion of the fifth amendment privilege. The judge stated that if he were unable to agree to the recommended sentence after seeing the presentence report, he would permit Hall to withdraw his plea. Hall entered his guilty plea to the conspiracy charge in open court. The prosecutor recited the facts of the robbery, implicating Rado, Donnelly, and Epprecht as well as Hall. Asked by the court if he had anything to add to the recitation, Hall responded "No, sir." When asked if the facts as thus set forth were "substantially correct and accurate," Hall stated "Yes, sir." Hall's replies were not made under oath. The court accepted Hall's plea,

2. Two defense witnesses, however, Rado's wife and his next door neighbor, testified that Donnelly and Epprecht had not been in Rado's house on the night of July 2.

3. Through several witnesses, it was proven that pine needles found in Hall's car were of the same genus as the bushes used by Donnelly and Epprecht to camouflage their approach to the victim's house.

the remaining counts were nollied, and further proceedings were scheduled for January, 1973.

It is undisputed that prior to calling Hall to the stand at Rado's trial, the state's attorney did not know whether or not Hall would in fact assert his Fifth Amendment privilege. At the outset of his direct examination, Hall freely testified that he was a Waterbury resident and had known Rado for twelve years, had been employed by Rado in two separate Connecticut restaurants, and had become Rado's friend. Hall identified Rado's house in a photograph and stated that he had been a visitor there from time to time. He also testified that he had made Epprecht's acquaintance while working in Florida, had given Epprecht his phone number upon returning to Connecticut, and that he met Epprecht in July 1972 in Connecticut. Hall refused to state precisely where he again met Epprecht on the ground that his answer might tend to incriminate him. The court ordered Hall to answer, however, and he complied.

The state's attorney proceeded to question Hall about his car and its confiscation by the police. When Hall claimed to be unable to identify his car in a photograph, the court declared him to be a hostile witness and ruled that the state was entitled to "cross examine" him. Hall admitted that in July, 1972, he had a blue suitcase in his car that belonged to Donnelly and Epprecht and contained their clothes, but he claimed that he was not certain how the suitcase found its way into the car's trunk. The state's attorney then returned to the subject of Hall's relationship with Rado. Hall invoked the privilege against self-incrimination when asked how well he knew Rado. At the court's direction, and once again without any objection to Hall's assertion of the privilege by the state's attorney, Hall responded that Rado was a "social acquaintance".

The state's attorney's questioning then shifted to the events leading up to the robbery. Asked if he had ever taken Epprecht and Donnelly to Rado's house, Hall again asserted the Fifth Amendment privilege. The judge excused the jury and explained to Hall that because he had pleaded guilty to the conspiracy charge his claim of privilege lacked merit. Hall's attorney was not present in the courtroom and the judge refused to hear argument from Rado's counsel on the question of Hall's privilege. Upon the jury's return, Hall again refused to answer whether he had ever brought Donnelly and Epprecht to Rado's house and asked to speak to his attorney. At the court's repeated direction, Hall finally answered that he had met with Epprecht and Donnelly at Rado's house on July 3, 1972. Although he initially refused to answer whether he had seen a walkie-talkie or a gun in Rado's house on that day, the court again ordered him to answer. In each instance, Hall responded that he was not sure.

The state's attorney next asked Hall whether he had planned the July 3d robbery with Rado, Epprecht and Donnelly. On four consecutive occasions, the court ordered Hall to answer this question, but each time Hall invoked his fifth amendment privilege. The court again excused the jury and warned Hall that his continued refusal to answer questions would result in his being found in contempt. Hall explained that he was acting on his attorney's advice and that he had not spoken to Rado about testifying. The state's attorney offered to withdraw the question and, upon the jury's return to the courtroom, the question was withdrawn.

At this juncture, the state's attorney directed Hall's attention to the guilty plea proceedings of the previous week:

"Q. Mr. Hall, do you remember being in Court here, in this courtroom here, on November 28, 1972?

A. Yes, I do.

Q. And I believe your attorney, Mr. Zeldes, was here with you; do you recall that?

A. Yes.

Q. Do you recall that the following occurred:—

[A defense objection was overruled.]

Q. Do you recall my saying in your presence:

'Yes, your Honor. On July 3rd, 1972, the home of a Mrs. Hyman, in the Bunker Hill section of Waterbury, was entered by Sean Donnelly and Wayne Epprecht. They were at the time armed with firearms. They had been driven to the scene by this accused in his own car'? That is referring to you.

Q. You were here with Mr. Zeldes?

A. Yes.

'Donnelly and Epprecht carried with them a bush, by means of which they gained entry in the home and attempted to commit the crime of robbery and burglary in the first degree. Prior to driving to the home, this scheme, this plan to commit this crime had been discussed with the conspirators Rado, Donnelly, Epprecht, and Hall. That is the factual recitation.'

And the Court said: 'Frederick Hall, you heard the State's Attorney set forth the facts here at the request of the Court. Do you have anything to add to the statement as set forth by Mr. McDonald at this point?' And you recall that you answered: 'No, sir' do you remember that?

A. Yes.

Q. Was that a true recitation of what happened?

The Witness: If your Honor please, I would like to talk to you.

The Court: You want to speak to the Court in the absence of the jury?

The Witness: Yes, I would.

The Court: I am going to excuse you, ladies and gentlemen."

The judge held unreported bench conferences first with Hall and then with counsel. The state's attorney thereupon withdrew the last question. The jury was called back and informed of its withdrawal. The state's attorney then directed Hall's attention once again to the November 28th plea hearing and stated:

Q. Now, do you recall, Mr. Hall, being in Court again on November 28, 1972, when the question and answers that I have just read to you were asked? Do you recall that?

A. Yes.

Q. You were here with Mr. Zeldes?

A. Yes.

Q. And you recall that after you were asked by the Court if you had anything to add to the statement as set forth by Mr. McDonald, at this point you answered, 'No, sir.'

Then the Court said: 'Are the facts set forth by Mr. McDonald substantially correct and accurate?'

And you replied: 'Yes, sir.'

Do you recall giving that answer to the Court?

A. Yes.

Q. In the presence of your attorney?

A. Yes.

Q. That the statement of facts that was read at that time was accurate, substantially correct and accurate; do you recall that?

A. Yes.

Q. Do you recall that part of that recitation included the words "prior to driving to the home, this scheme, this plan to commit this crime had been discussed with the conspirators Rado, Donnelly, Epprecht, and Hall;" do you recall that being said in Court?

The Court: He previously answered that he did recall it in a prior question, Mr. McDonald.

Mr. McDonald: Yes.

The Court: He is asking you again: Do you recall it?

The Witness: He is asking me the same question again?

By Mr. McDonald:

Q. Yes. You already answered that you did.

A. It would be my same answer.

The state's attorney next sought to explore Hall's possible bias in favor of petitioner. When Hall stated that he could not remember how many times he had eaten lunch with Rado since the commencement of the trial, the state's attorney asked him whether Hall had a bad memory. Hall began to state that he did not wish to answer, but before he could finish the court excused the

jury and immediately found Hall in contempt.

After a recess, Rado's counsel moved for a mistrial. The motion was denied, and the jury returned to the courtroom. Rather than repeating the question about Hall's memory, the state's attorney asked the following series of questions:

"Q. Mr. Hall, did you plan at Mr. Rado's home on the afternoon of July 3, 1971, with Epprecht and Donnelly, together with Mr. Rado, to rob Mrs. Hyman?

The Witness: If your Honor please, I refuse to answer the question on the grounds that it might tend to incriminate me.

Mr. McDonald: I won't press the question, your Honor.

By Mr. McDonald:

Q. In your presence were firearms given to Epprecht and Donnelly at the home of Donald Rado?

The Witness: If your Honor please, I refuse to answer the question on the grounds that it might tend to incriminate me.

Mr. McDonald: I won't press that question.

By Mr. McDonald:

Q. Were the walkie-talkies given to these men or to Donnelly and to you by Mr. Rado to perpetrate this armed robbery against Mrs. Hyman on that day?

The Witness: If your Honor please, I refuse to answer the question on the grounds that it might tend to incriminate me.

By Mr. McDonald:

Q. Can you see the home of Mrs. Hyman from the back porch of Mr. Rado's house?

The Witness: If your Honor please, I refuse to answer the question on the grounds that it might tend to incriminate me."

At that point, the state's attorney concluded his direct examination.

On cross-examination, Rado's counsel asked Hall whether he had been asked to sign a statement implicating Rado in the robbery and whether the state's attorney had offered a recommendation of a lenient sentence in return for Hall's testimony. Hall asserted his Fifth Amendment privilege once again, but at the court's direction responded that his attorney had been offered a deal, the specifics of which he could not remember and that his attorney had asked him to sign a statement incriminating Rado but that he had refused to do so. Hall then explained how he, Epprecht and Donnelly arrived at Rado's house on July 3rd. Hall testified that his car had broken down early that morning and he had asked Rado to pick up his friends Epprecht and Donnelly at a motel in town. Rado brought Epprecht and Donnelly to Hall's house while Hall repaired his car. After fifteen or twenty minutes, Rado, Epprecht and Donnelly left. When asked if he had ever been to the Radio Shack store in Waterbury, Hall asserted his Fifth Amendment privilege and Rado's counsel withdrew the question.

On redirect, Hall testified that after Rado, Epprecht, and Donnelly left Hall's house, Rado brought Epprecht and Donnelly to Rado's house and that Hall met them there that afternoon. When the state's attorney questioned Hall about his reluctance to sign any written statements about the crime, Hall again raised the privilege and these questions were withdrawn. When the state's attorney concluded his redirect, the court again excused the jury. The court noted that there were several questions asked by both sides which the witness refused to answer, but that neither side had pressed for answers to those questions. The court then vacated the finding of contempt and released Hall from custody. Hall was excused, and the jury returned to the courtroom.

## II. THE CONSTITUTIONAL CLAIMS

Rado raised two constitutional claims below, both of which the district court found to be meritorious. First, the court held that the state's attorney's recitation from the transcript of Hall's plea hearing violated

Rado's right to confront the witnesses against him. Second, the court held that the last four questions by the state's attorney on direct examination were posed notwithstanding the expectation that Hall would assert his privilege against self-incrimination and that they thus constituted prosecutorial misconduct and a denial of due process of law.

## A. The Confrontation Clause Claim

■■■ The Confrontation Clause of the Sixth Amendment, applicable to the states via the Due Process Clause of the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), guarantees to a criminal defendant the right "to be confronted with the witnesses against him." The origins of the clause have been traced to the desires of the Framers to eradicate "trial by affidavit", a procedural abuse common during the colonial era, and to ensure the defendant the opportunity to challenge his accusers face-to-face before a jury. *California v. Green*, 399 U.S. 149, 156, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *United States v. Belle*, 593 F.2d 487, 502 n. 4 (3d Cir. 1979) (en banc) (Gibbons, J., dissenting). "[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause." *California v. Green, supra*, 399 U.S. at 157, 90 S.Ct. at 1934. These values are usually served by providing the defendant with ad-

equate opportunity to cross-examine the state's witnesses, *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), although there may be instances in which the "indicia of reliability" are so strong that an extrajudicial statement may be placed before the jury even though there is no opportunity for the defendant to confront the declarant. *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion). In all instances, however, "[t]he decisions of [the Supreme] Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Id., quoting California v. Green, supra*, 399 U.S. at 161, 90 S.Ct. 1930.[4]

As he did in the court below, Rado has placed his principal reliance upon the case of *Douglas v. Alabama, supra*. In *Douglas*, two defendants were tried separately on charges of assault with intent to murder. Defendant Loyd was tried first and convicted. The state then called him to testify at Douglas' trial. Because Loyd wished to appeal his conviction, he gave only his name and address and refused to answer any questions put to him concerning the alleged crime, citing his privilege against self-in-

---

4. The Confrontation Clause serves many of the same values as the rule against hearsay, but they are not congruent evidentiary principles. The admission of an extrajudicial statement pursuant to a recognized hearsay exception may nonetheless violate the Confrontation Clause; conversely, the admission of such a statement in violation of hearsay rules does not necessarily result in denial of confrontation rights. *California v. Green, supra*, 399 U.S. at 155–56, 90 S.Ct. 1930. Thus, it is not particularly relevant to our task to determine whether the state's attorney's recitation of the questions and answers at Hall's plea hearing was admissible for substantive purposes under Connecticut's hearsay rules. *See id.* at 164, 90 S.Ct. at 1938 ("there is little difference as far as the Constitution is concerned between permitting prior inconsistent statements to be used only for impeachment purposes, and permitting them to be used for substantive purposes as well").

It may be noted parenthetically, however, that under the Federal Rules of Evidence, Hall's answers to the state's attorney's incriminating questions at his plea hearing might constitute statements against penal interest pursuant to Rule 804(b)(3). *See, e. g., Chambers v. Mississippi*, 410 U.S. 284, 299 & n. 18, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *United States v. White*, 553 F.2d 310, 312–14 (2d Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977). Such statements, however, are not admissible in federal court unless the declarant is "unavailable". Although a declarant who "persists in refusing to testify concerning the subject matter of his statement despite a court order to do so" is considered to be "unavailable" under Rule 804(a)(2), there was no such order with respect to the question at issue during Hall's direct testimony.

crimination. The court, on the state's motion, declared Loyd to be a "hostile witness" subject to cross-examination. The prosecutor then produced a document purporting to be Loyd's signed confession and read it aloud in the presence of the jury, pausing every few sentences to ask Loyd if he had made the statement in question. In all, the prosecutor posed some 21 questions, occupying seven pages in the printed record. Loyd asserted the privilege and refused to answer after each question. The state then called three law enforcement officers who identified the document produced by the prosecutor as Loyd's signed confession. The confession incriminated Douglas, and he was convicted. Reversing Douglas' conviction, the Supreme Court unanimously held that Douglas' inability to cross-examine Loyd as to his alleged confession violated his Confrontation Clause rights. *Id.* 380 U.S. at 419, 85 S.Ct. 1074.

> Loyd's alleged statement that the petitioner fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder. Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true.   .   .   .
> Since the [prosecutor] was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to but not admitted by him.

*Id.*

Although the facts in *Douglas* resemble to some extent those of the instant case, we believe that *Douglas* is distinguishable in several important respects. First, the recitation of Hall's answers to the state's attorney's questions at the plea hearing were neither "crucial" to the state's case against Rado, *Douglas v. Alabama, supra,* nor "devastating" to Rado's defense. *Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *See, e. g., Dutton v. Evans, supra,* 400 U.S. at 87, 91 S.Ct. 210; *United States v. Wright,* 588 F.2d 31, 38–39 (2d Cir. 1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Mangan,* 575 F.2d 32, 44 (2d Cir. 1978), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1979); *United States v. White,* 553 F.2d 310, 314 (2d Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977); *United States v. Puco,* 476 F.2d 1099, 1102–08 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973); *United States v. Rogers,* 549 F.2d 490, 500 (8th Cir. 1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Because the extrajudicial statements in *Douglas* were the *sole* direct evidence of the defendant's guilt, they "clearly bore on a fundamental part of" and "added critical weight to" the state's case. 380 U.S. at 420, 85 S.Ct. 1074. In the instant case, by contrast, the direct testimony of Donnelly and Epprecht and strong circumstantial evidence provided by the walkie-talkie and pistol traced to his possession had seriously weakened Rado's defense. This strong evidence of guilt obviously reduced the deleterious impact of the state's attorney's recitation.

■ Second, unlike the declarant in *Douglas,* Hall was available for effective cross-examination concerning the veracity of his extrajudicial statement. The trial judge ruled that Hall could not assert the Fifth Amendment privilege because of his plea of guilty to the conspiracy charge. Even if it were determined that this ruling was erroneous,[5] *Douglas* clearly holds that

---

**5.** Whether or not this is the case is open to dispute. Under Connecticut law, a nollied charge may be reopened by the prosecution within thirteen months. *See v. Gosselin,* 133

resolution of a Confrontation Clause claim does not turn upon the validity of the declarant's claim of privilege. 380 U.S. at 420, 815 S.Ct. 1074. The issue remains whether or not effective confrontation was possible. Hall was a reluctant witness, but it suffices to note that at the court's direction, and under penalty of contempt, he responded to questions concerning such matters as the circumstances under which he met Rado and Epprecht, when counsel insisted upon an answer. Although Hall never answered any questions regarding the details of the robbery, it is by no means clear that he would have continued to refuse to answer if the parties had insisted. Moreover, unlike the declarant in *Douglas*, Hall admitted that he had made the extrajudicial statement implicating Rado and had vouched for its accuracy when made.[6] Counsel for Rado could have attempted to show that Hall had confessed to a crime he had not committed or, more likely, that the portions of his statement implicating Rado were untrue. Counsel's failure to cross-examine Hall in this manner, or to seek the aid of the court in eliciting this testimony, did not render Hall unavailable for the purposes of the Confrontation Clause. *See United States v. Insana*, 423 F.2d 1165, 1168 (2d Cir.), *cert. denied*, 400 U.S. 841, 91 S.Ct.

Conn. 158, 161, 48 A.2d 560 (1946). Therefore, it may be argued, on the one hand, that Hall risked self-incrimination on the charges of robbery and burglary which had been nollied pursuant to the plea bargain. *See, United States v. Yurasovich*, 580 F.2d 1212, 1218 (3d Cir. 1978) (1979) ("if the witness is still subject to prosecution for other crimes which his testimony might tend to reveal, the privilege remains"). Alternatively, it might be contended that Hall would be entitled to "specific performance" of his plea bargain agreement, under which the substantive counts would be dismissed. *See United States v. Rocco*, 587 F.2d 144, 148 n. 12 (3d Cir. 1978) citing *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1972).

6. In *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), the Supreme Court held that the declarant need not specifically affirm a prior statement as his in order to satisfy Confrontation Clause requirements. In *Nelson*, the declarant denied making the extrajudicial statement attributed to him, but was available to testify as to the underlying facts. Whether the declarant (1) denies having made

83, 27 L.Ed.2d 76 (1970); *Wade v. Yeager*, 415 F.2d 570 (3d Cir.), *cert. denied*, 396 U.S. 974, 90 S.Ct. 466, 24 L.Ed.2d 443 (1969); *United States ex rel. Smith v. Reincke*, 354 F.2d 418, 421 (2d Cir. 1965), *cert. denied*, 384 U.S. 993, 86 S.Ct. 1896, 16 L.Ed.2d 1010 (1966).

Finally, Hall's statements at his plea hearing carry greater "indicia of reliability" than did Loyd's confession in *Douglas*. *Dutton v. Evans, supra*. To be sure, declarations made against penal interest which also inculpate the accused must be treated with care for the declarant may be seeking to "curry favor with the authorities." *United States v. White, supra*, 553 F.2d at 313 n. 4 (quoting Advisory Committee Note to F.R.E. 804(b)(4)). Hall's statements, however, were made in open court before a judge rather than "in the coercive atmosphere of [police] interrogation, as [in] *Douglas* . . ." 400 U.S. at 87, 91 S.Ct. at 219. Moreover, unlike the confession in *Douglas*, the direct testimony of Donnelly and Epprecht and the strong circumstantial evidence of Rado's guilt corroborated Hall's statements, thus adding some additional assurance of reliability. *See, e. g., Chambers v. Mississippi*, 410 U.S. 284, 300–01, 93 S.Ct. 1038, 85 L.Ed.2d 297 (1973); *United States v. White, supra*, 553 F.2d at 314.

the extrajudicial statement, *United States v. Ballentine*, 410 F.2d 375, 376–77 (2d Cir. 1969), *cert. denied*, 397 U.S. 928, 90 S.Ct. 935, 25 L.Ed.2d 107 (1970); *United States v. Peterson*, 435 F.2d 192, 195–96 (7th Cir. 1970), *cert. denied*, 403 U.S. 907, 91 S.Ct. 2212, 29 L.Ed.2d 683 (1971); (2) admits having made the statement, but denies its truth; *United States ex rel. Pugach v. Mancusi*, 441 F.2d 1073, 1075 (2d Cir.), *cert. denied*, 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971); or (3) claims an inability to recall the statements or its contents, *United States v. Insana*, 423 F.2d 1165, 1170 (2d Cir.), *cert. denied*, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970); *United States ex rel. Thomas v. Cuyler*, 548 F.2d 461, 462–63 (3d Cir. 1977); *United States v. Rogers, supra*, 549 F.2d at 494–95; *United States v. Payne*, 492 F.2d 449, 451–54 (4th Cir.), *cert. denied*, 419 U.S. 876, 95 S.Ct. 138, 42 L.Ed.2d 115 (1974), courts have held that a jury has a satisfactory basis to evaluate the truth of the prior statement so long as the declarant is willing to testify about the underlying facts.

■ In short, we conclude that Rado's right of confrontation was not violated by the state's attorney's reading from the transcript of Hall's guilty plea proceeding for the following reasons: 1. the recitation was neither "crucial" to the state's case against Rado nor "devastating" to his defense; 2. Hall was available for cross-examination at trial as to the veracity of his extrajudicial statements in light of the court's ruling that Hall had no Fifth Amendment privilege to assert, its willingness to impose sanctions for what it perceived to be an improper assertion of the privilege and Hall's eventual response to questions when ordered to do so by the court; and 3. Hall's statements, though inculpatory of Rado, were reliable to the extent that they were corroborated by other evidence in the case, both direct and circumstantial, and were made in a non-coercive atmosphere.

## B. *The Due Process Claim*

■ Rado's alternative basis for challenging his conviction is that the state's attorney's questioning of Hall with knowledge that Hall would refuse to answer constituted prosecutorial misconduct. Rado contends that the prosecutor's conduct throughout the course of the examination, but particularly at its conclusion, denied Rado's right to due process of law.

The leading case in this area is *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), in which the Supreme Court, relying heavily upon Judge Learned Hand's decision in *United States v. Maloney*, 262 F.2d 535 (2d Cir. 1959), articulated two principles on which a witness' invocation of his Fifth Amendment privilege may constitute error: 1. "prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege"; and 2. when "in the circumstances of a given case, inferences

from a witness' refusal to answer added critical weight to the prosecution's case in a forum not subject to cross-examination . . . ." 373 U.S. at 186–87, 83 S.Ct. at 1155. In *Douglas v. Alabama, supra*, these principles were given constitutional significance and made applicable to the states. *See* 380 U.S. at 419–20, 85 S.Ct. 1074 (citing *Namet* and *Maloney, supra* ). In applying the *Namet* rule to particular cases, the courts have analyzed various factors, including the prosecutor's intent in calling the witness, the number of questions asked, their importance to the state's case, whether the prosecutor draws any inference in his closing argument from the witness' refusal to answer in his closing argument and whether the trial judge gives a curative instruction. *Moynahan v. Manson*, 419 F.Supp. 1139, 1149 (D.Conn.1976), *aff'd*, 559 F.2d 1204 (2d Cir.), *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 229 (1977).

We do not believe that the record before us can support a finding of prosecutorial misconduct based upon either of the *Namet* principles. It is undisputed that, prior to calling Hall to the stand, the state's attorney did not know that Hall would assert his privilege against self-incrimination. "Since the government has the obligation to present such relevant testimony as the witness may possess, it must in turn have a reasonable opportunity to test whether that testimony will be forthcoming, and if not, whether it can be compelled." *United States v. Mayes*, 512 F.2d 637, 649 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). Moreover, the state's attorney apparently believed, as in *Namet*, that as a matter of law Hall had no Fifth Amendment privilege to invoke, reasoning that Hall's plea of guilty to the conspiracy charge nullified his right against self-incrimination.[7] The trial judge evidently shared this view and repeatedly directed Hall to respond and found him in contempt

---

7. It is apparent from the hearing held below that the state's attorney knew that as a matter of Connecticut law, the prosecution may generally vacate a nolle prosequi and reinstituted a prosecution without violating principles of dou-

ble jeopardy. He also believed, however, that in the context of a plea bargain, nollied charges could not be reinstituted "so long as the plea bargain stood." (Appendix, at 154).

when he did not. Under the circumstances, we cannot find that the state's attorney's decision to press further and to ask Hall the final four questions concerning the actual perpetration of the robbery was a deliberate attempt by the state to capitalize on the witness' refusal to testify. While the state's attorney should not have withdrawn each of these questions without asking the court for its assistance in eliciting the desired testimony, we do not view this single lapse, when viewed in the context of a two-week trial, as a calculated ruse aimed at inducing the jury to draw improper inferences against Rado. *See Namet v. United States, supra,* 373 U.S. at 188–89, 83 S.Ct. 278.

Turning to the second prong of the *Namet* rule, we also cannot find that Hall's refusal to answer added "critical weight" to the state's case. This is not a case like *Douglas v. Alabama, supra, United States v. Maloney, supra* or *Robbins v. Small,* 371 F.2d 793 (1st Cir.), *cert. denied,* 386 U.S. 1033, 87 S.Ct. 1483, 18 L.Ed.2d 594 (1967) in which "a witness' refusal to testify is the only source, or even the chief source, of the inference that the witness engaged in criminal activity with the defendant." *Namet v. United States, supra,* 373 U.S. at 189, 83 S.Ct. at 1156. Both the testimony of Donnelly and Epprecht and the strong circumstantial evidence adduced at trial strongly implicated Rado in the planning of the robbery. Hall's claims of privilege were merely "cumulative support" for inferences already established through witnesses who were subject to full and effective cross-examination.[8] *See, e. g., Cota v. Eyman,* 453 F.2d 691, 695 (9th Cir. 1971), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2054, 32 L.Ed.2d 338 (1972); *United States v. Roselli,* 432 F.2d 879, 903 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971); *Moynahan v. Manson, supra,* 419 F.Supp. at 1149. Rado does not claim that the state's attorney made any reference to Hall's refusal to testify in his closing argu-

ment to the jury. While the trial judge gave no curative instruction in this case, it does not appear that Rado's counsel asked the court to do so. In sum, analyzed under either of the theories set forth in *Namet,* we cannot find that Rado was denied a fundamentally fair trial.

## CONCLUSION

Because we find no violation of Rado's constitutional rights of confrontation and due process, the judgment of the district court is reversed and the cause is remanded with instructions to deny the petition.

---

8. We also reject Rado's alternative contention that Hall's invocation of the privilege violated Rado's rights under the Confrontation Clause since we believe, for the reasons set forth in the text, that Hall's refusal to answer did not lend critical weight to the state's case. *See Douglas v. Alabama, supra.*