UNITED STATES of America, Plaintiff-Appellee,

v.

James Phillip PETERSON, Defendant-Appellant.

No. 16944.

United States Court of Appeals, Seventh Circuit.

Nov. 16, 1970.

Rehearing Denied Jan. 12, 1971.

---

5. Walter Ullerup, who was originally, a defendant in this action, died in a motorcycle accident prior to trial.

Ronald P. Alwin, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., David M. Hartigan, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

SWYGERT, Chief Judge.

On December 7, 1962 two armed men robbed the Archer-Hoyne Savings and Loan Association in Chicago. Appellant, James Phillip Peterson, and Arthur Rachel were charged with the robbery, in violation of 18 U.S.C. § 2113(a) and (d). Peterson was found guilty by the jury at a joint trial during which Rachel pleaded guilty. On this appeal, Peterson assigns three grounds for reversal: a denial of his sixth amendment right to a speedy trial; the admission into evidence of out-of-court statements by Rachel implicating him in the robbery; and the admission of certain identification testimony by an eye-witness to the robbery.

I

■ Defendant was arrested on May 26, 1966, and indicted on June 7, 1966. After a delay of eighteen months, his trial began November 27, 1967. Delay of this duration does not itself demonstrate that defendant should be granted the relief he requests—a dismissal of the charge—even though he was incarcerated during that time. United States v. Jones, 403 F.2d 498 (7th Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969).[1] He must show

1. *Jones* involved an eighteen-month pre-indictment delay after the defendant had been positively identified, but we believe that the reasoning of that case is equally applicable to the issue of post-indictment delay which has been raised by Peterson.

not only that the delay was unreasonable under the circumstances, but also that it prejudiced him or was purposeful or oppressive. United States v. Kaufman, 393 F.2d 172 (7th Cir. 1968), cert. denied, 393 U.S. 1098, 89 S.Ct. 892, 21 L. Ed.2d 789 (1969). Although an eighteen-month lapse between arrest and trial seems on its face an inordinate delay, we conclude that it was not unreasonable under the circumstances. No purpose would be served by reciting all the various procedural events occurring during the eighteen-month interim. Suffice it to say that much of the delay may be attributed to the defendant himself. Between June and August 1966, two separate appointed attorneys withdrew at defendant's request. He then attempted to represent himself and filed various pretrial motions. After briefing, which was not concluded by defendant until December, the district court ruled on certain motions in January 1967. After more briefing, all motions were disposed of late in March. During the latter part of June, Peterson's newly-appointed attorney stated to the court that he was "ready for a trial date to be set." Counsel for codefendant Rachel then asked the court to set "a trial date for the Fall." No objection to this request was made, and the case was set for trial October 23, 1967. On that date the Government was ready for trial, but neither Peterson nor his attorney was present and codefendant Rachel had not been returned from Leavenworth Penitentiary. The trial was then put over to November 27.

When the entire record is examined, it is significant to note that at no time did the Government request a continuance or indicate that it was unprepared for trial. Moreover, it is apparent that during a large portion of the eighteen-month lapse the defendant was in fact not ready for trial.

Defendant claims that because of his prolonged incarceration he was unable to locate witnesses who could have supported his theory of the case and provided him with an alibi. The claim is unsupported by specific allegations. Neither are the missing witnesses named nor is the alibi articulated. While we recognize that the inability to specify missing witnesses may be the product of the prejudice alleged—the inability to recall events occurring years earlier—we are not convinced by Peterson's bald assertion that had the trial occurred a year earlier alibi witnesses might have been found.

We conclude that no actual prejudice was suffered by defendant in the sense that the delay impaired his ability to defend himself. Whatever other prejudice or oppressiveness he may have suffered were not so substantial as to require a dismissal of the indictment. It must be noted that defendant cannot attribute his being incarcerated solely to his inability to furnish bail on this federal charge. On September 26, 1966, the district court, in explaining its denial of a motion for a recognizance bond, noted that defendant did not controvert that he was "presently wanted by the Illinois authorities for violation of parole and would be committed to state custody if released by this Court."

We are of the view that, although a regrettable amount of foot-dragging occurred, the delay was not unreasonable under the circumstances. The delay was not purposeful, nor did the protraction of pre-trial proceedings create an intolerably oppressive extension of defendant's incarceration prior to the determination of guilt. Dismissal of an indictment for a violation of the sixth amendment right to a speedy trial is an extraordinary remedy and must be granted only if it appears that the right has been clearly violated. All relevant facts must be considered; further, they must be viewed in their totality. When that is done here, the grant of the requested dismissal is not compelled.

II

The Government's evidence showed that the robbers left the savings and loan association with the stolen money

in a shopping bag. Government witness Lupe Powers testified that sometime early in December 1962 (the robbery occurred on December 7) Peterson and Rachel came to her apartment with a large sum of money in a brown shopping bag and put the money in a dresser drawer and that a few days later the defendant returned to the apartment and took the money. Mrs. Powers also testified that subsequently the defendant told her that he could not purchase a car in his name and gave her $2,100 in cash with which to purchase a car for him.

Another Government witness, Louis Bartemio, testified that while he was in Mrs. Powers' apartment in December 1962, Peterson and Rachel came to the apartment with a brown shopping bag and went into another room with Mrs. Powers whom he heard exclaim, "My God, I never saw so much money!" Bartemio was then permitted, over objection, to testify concerning two conversations he had had with Rachel. Bartemio testified that codefendant Rachel after coming out of the bedroom in Mrs. Powers' apartment told him that Peterson and he each had $7,000 and that "this money has just come from that Archer-Hoyne Savings and Loan * * * that's the bank we had just robbed." The witness then testified that while he and Rachel were driving past the Archer-Hoyne Savings and Loan Association in January 1963, Rachel pointed out the institution as the bank he and Peterson had robbed and said that he did not know why he had taken Peterson along since Peterson had simply stood inside the door while he had run in, jumped over the counter, and taken the money.

Peterson contends that allowing the hearsay statements of codefendant Rachel, as related by Bartemio, to be admitted into evidence at his trial constituted reversible error under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We would have no difficulty agreeing with this contention but for the fact that Rachel was later called by defendant as a witness in his behalf. Rachel testified that he and

Bartemio, not Peterson, had robbed the savings and loan association. He further testified that the money seen in Mrs. Powers' apartment was not stolen, but was part of a counterfeiting operation which he and Peterson were connected with.

We think that our recent holdings in United States v. Marine, 413 F.2d 214 (7th Cir. 1969), cert. denied, 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493 (1970), and Trigg v. United States, 430 F.2d 372 (7th Cir. 1970), are dispositive of defendant's contention. In *Marine* a codefendant, the declarant of hearsay statements incriminating the defendant, took the stand and testified extensively. We held that the defendant "was in no manner denied his Sixth Amendment right of confrontation, a fact which was vital if not determinative in *Bruton*." 413 F.2d at 217. In *Trigg* we held that the defendant "was never barred from cross-examining the source of any incriminating hearsay evidence" and that he made no effort "to procure further testimony by Burris [the codefendant and declarant] either in denial or explanation of the statements attributed to him." 430 F.2d at 374–75. In that case the codefendant had testified on his own behalf, and his out-of-court statements implicating defendant Trigg were introduced through a federal agent's rebuttal testimony.

Peterson, like the defendants in *Marine* and *Trigg*, was not denied his right of confrontation by reason of the introduction of the hearsay statements of his codefendant. Rachel took the stand and testified for the defendant. Although neither defense counsel nor the prosecution inquired about the statements made to Bartemio, the defendant was free to make such inquiry. He cannot predicate error on the failure to avail himself of this opportunity.

Defendant argues that *Bruton* requires reversal notwithstanding Rachel's testimony, citing Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). He maintains that cross-examination is possible only when

the declarant takes the witness stand and admits to making the inculpatory statement. In *Douglas*, an alleged accomplice was called by the state at Douglas' trial; but since the accomplice, who had been tried first and found guilty, had an appeal pending, he invoked the privilege against self-incrimination. The accomplice's extrajudicial statement incriminating Douglas was read to him while he was on the stand, and he refused to affirm, deny, or attempt to explain it. Peterson's trial was much different; Rachel was not only placed on the stand, he testified freely. When confrontation is available, adequate safeguards are provided against prejudice of the type illustrated by *Bruton*. Wade v. Yeager, 415 F.2d 570, 572 (3d Cir.), cert. denied, 396 U.S. 974, 90 S.Ct. 466, 24 L.Ed.2d 443 (1969); Trigg v. United States, 430 F.2d 372 (7th Cir. 1970). The right of cross-examination is not necessarily to be equated with the right of confrontation. When the declarant of the hearsay statements introduced into Peterson's trial took the stand and willingly testified, Peterson's sixth amendment right to confront the witness against him was afforded adequate recognition no matter what the trial testimony of the hearsay declarant turned out to be. Apropos of the situation here, the Supreme Court in California v. Green, 399 U.S. 149, 159, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970), observed:

> The most successful cross-examination at the time the prior statement was made could hardly hope to accomplish more than has already been accomplished by the fact that the witness is now telling a different, inconsistent story, and—in this case—one that is favorable to the defendant.

Moreover, the Court at a later point in the majority opinion noted that, "[N]one of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial." 399 U.S. at 161, 90 S.Ct. at 1936.

## III

The final contention is that Henry J. Wolske, Sr.'s identification of Peterson as one of the robbers was so vague and uncertain that it lacked probative value and should not have been admitted. On voir dire Wolske, a bank director, admitted that he could not be positive he would recognize the man who held a gun on him at the bank and that he would only be identifying "somebody who looks like somebody." On direct examination he described the shape of the robber's head and the man's height and weight. When directed to look around the courtroom and attempt to identify the robber, Wolske said of the defendant:

> [I]t looks like the man I saw in front of me in the office, with this narrowed-down face.
>
> \*    \*    \*    \*    \*    \*
>
> The facial expression, the man that held me up is like that third man there at the table.
>
> \*    \*    \*    \*    \*    \*
>
> Well, I can't swear that that's the same man, no, but it's similar.

In response to the question, "Does he [the defendant] resemble the man?", Wolske replied, "Yes." While this identification was not positive, we believe that it was not so utterly lacking in probative value that the trial judge was required to reject it. Though qualified, it did tend to corroborate the Government's other evidence identifying Peterson as one of the robbers. We do not believe that allowing the jury to consider this testimony resulted in any prejudice.

Defendant does not contend that the Government's evidence is insufficient to support the conviction. He argues only that the admission of this identification testimony prejudiced him because, even though it was without true probative value, it gave the Government some direct evidence that he was in the bank and might therefore have influenced the jury to believe the testimony of Bartemio and disbelieve that of Rachel.

The weight to be given to identification testimony is normally a question for the jury. Though we would agree that Wolske's testimony standing alone would not be sufficient to sustain the conviction, when considered together with the other evidence in the case, the identification was sufficiently probative to justify allowing the jury to consider it.

In cases involving similar issues we have upheld the admission of evidence of slight probative value so long as it has some tendency to corroborate other evidence showing a defendant's complicity in the crime. United States v. Sears, 332 F.2d 199 (7th Cir. 1964); United States v. Morabette, 119 F.2d 986 (7th Cir. 1941). *See also* Smith v. United States, 358 F.2d 695 (5th Cir.), cert. denied, 384 U.S. 971, 86 S.Ct. 1862, 16 L. Ed.2d 682 (1966); Dixon v. United States, 7 F.2d 818 (8th Cir. 1925). We believe that the facts here fall within the rule of the cases cited and that the weight and credibility of the evidence in question were for the jury.

The judgment of conviction is affirmed.