**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Howard BROWN and Alexander Bishop,
Defendants-Appellants.**

**Nos. 81, 86, Dockets 81–1136, 81–1138.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1982.

Decided Jan. 24, 1983.

Bernard S. Greenbaum, Brooklyn, N.Y., for defendant-appellant Brown.

Philip Katowitz, Brooklyn, N.Y., for defendant-appellant Bishop.

Thomas H. Roche, Asst. U.S. Atty., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., E.D.N.Y., Mary McGowan Davis, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for plaintiff-appellee.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

Howard Brown and Alexander Bishop appeal from a judgment of the Eastern District of New York convicting them, after a jury trial before Judge Edward R. Neaher, of bank robbery and armed bank robbery, 18 U.S.C. §§ 2113(a) and (d). We reverse for the reason that the admission into evidence for impeachment purposes of a post-indictment statement taken from Brown violated his Sixth Amendment right to counsel and the government's use of the statement denied his co-defendant Bishop a fair trial.

On October 10, 1979, three men and two women armed with guns robbed the National Bank of North America in St. Albans, Queens, New York, of approximately $7,000. According to the later trial testimony of one of the women, Maxine Williams, two of the robbers were Brown and Bishop, who entered the bank behind their accomplices, disarmed the bank guard, pushed him to the floor, and announced a holdup. Williams testified that Bishop and another man guarded the bank floor and that Brown vaulted a 10 to 12-foot high bandit barrier, cutting his hand in the process, then opened the door to the tellers' area and, assisted by one of the women, emptied cash from the tellers' drawers. Meanwhile Maxine Williams guarded the bank manager.

Ms. Williams' testimony was corroborated by that of the assistant bank manager, John Jackson, who identified the defendants at trial, pointing out Brown as the injured vaulter and Bishop as the robber who stood on the bank floor holding a gun. In addition, the government offered the testimony of FBI agent Robert Daniel Shea that he had examined the bandit barrier shortly after the robbery and removed latent fingerprints and a dark substance believed to be blood. An FBI fingerprint expert identified the fingerprints as those of Howard Brown. Another FBI agent identified the dark substance as human blood, Group A. Brown stipulated that his blood was Type A. Photographs taken by a bank surveillance camera showed the robbery but did not reveal the individuals' faces.

Brown testified in his defense that two days before the robbery he had gone into the bank with his girlfriend who had business there. He stated that after they noticed the bandit barrier his girlfriend challenged him to touch the top. Brown testified that he was 5′ 11″ tall and able to dunk a basketball from a standing position "in a rim, in a hoop" 10½ feet high. He identified the spot that he jumped up to and touched as the same spot where one of the robbers had vaulted the bandit barrier during the robbery. Brown denied knowing Maxine Williams and claimed no involvement in the robbery.

On cross-examination Brown was questioned about a statement [1] he had given to FBI Agent Shea on June 9, 1980, approximately one hour before his arraignment, following his indictment a month earlier on May 2, 1980, his arrest on May 19 and continuous incarceration thereafter. Brown admitted he had spoken to Agent Shea but denied telling Shea of his involvement in the robbery and denied having named the other four participants in the robbery, including co-defendant Bishop. In rebuttal Agent Shea testified that after he had advised Brown orally of his *Miranda* rights, Brown admitted his involvement in the robbery, including vaulting the barrier

---

1. The statement was an unsigned transcript of notes made by the government agent of admissions made by Brown in an oral interview.

and cutting his hand. Shea also testified that at the same time Brown, who was not represented by counsel, had told him how many other individuals had participated in the crime and had revealed their names. At the time when he took the statement Shea was aware that Brown would be arraigned within the hour, at which time counsel would be appointed to represent him.

## DISCUSSION

### The Use of Brown's Post-Indictment Statement

Brown argues that Judge Neaher's admission for impeachment purposes of the statement taken from him by Agent Shea after his indictment and an hour before his arraignment violated his Sixth Amendment right to counsel, rendering the statement inadmissible for impeachment purposes under *New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979). The government all but concedes that the taking of Brown's post-indictment statement without a valid waiver of his right to counsel violated his Sixth Amend-

ment rights under *United States v. Mohabir,* 624 F.2d 1140, 1151 (2d Cir.1980), which was not handed down until after the statement was obtained. The prosecutor did not use the statement in the government's case-in-chief. The government contends, however, that Brown's statement was properly admitted for impeachment purposes under *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), to show that Brown had perjured himself during his direct examination.[2]

Although Shea was aware that Brown would have counsel appointed for him within the hour upon arraignment, Shea conceded that he did nothing to explain to Brown the significance of his legal situation, or that he would shortly have the advice and representation of a lawyer.[3] Since Brown had been indicted prior to his interview with Agent Shea, his right to counsel had attached. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964); *United*

---

2. Brown diligently sought to protect his Sixth Amendment rights prior to and at trial. When he objected before trial the prosecutor advised that he would not offer the statement as part of his case but reserved the right to use it at such other "phase" as might be permissible, in which event he would redact Bishop's name to avoid a *Bruton* problem (referring to *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). When the prosecutor later started to use the statement on cross-examination of Brown, the latter's counsel again objected, argued that the evidence violated Brown's constitutional rights and that despite *Harris* "[t]here is a United States Supreme Court case that came down" (apparently meaning *Portash*), and requested a continuance to present a brief, which was denied by the trial judge on the ground that the issue was governed by *Harris.*

3. Agent Shea testified:
 "Q: You did not know then when you went ... to examine Mr. Brown in the basement of this courthouse that Mr. Brown had already been indicted by the Grand Jury on ... May 5th, 1980?
 A: I can't recall. I may have known, but I'm not positive that I did at this time.
 Q: Had you spoken to Mr. Roche [the AUSA] prior to June 10th?
 A: I spoke to Mr. Roche many times prior to June 10th, yes.

 Q: ... Mr. Roche never told you that there was an indictment handed down already?
 A: ... as I said, I don't recall. If he did, he may have. I don't recall.
 Q: Do you recall that he was awaiting arraignment upstairs before the U.S. Magistrate.
 A: Yes.
 Q: Do you know on what charge he was awaiting arraignment?
 A: On this bank robbery.
 Q: Do you know if he had an attorney assigned to him?
 A: No, I did not know.
 Q: Are you familiar with the procedure in this district?
 A: Yes.
 Q: When is an attorney assigned to him?
 A: When he's arraigned.
 Q: How much prior to that assignment did you speak to Mr. Brown?
 A: Possibly an hour, maybe a little less.
 ....
 Q: What time of day was this interview taking place?
 A: I believe it was late afternoon, I'm not sure. I believe it was maybe two or 3:00 o'clock.
 ....
 Q: How did you read him his rights, from what?

*States v. Mohabir, supra,* 624 F.2d at 1146. Indictment marks the crucial point after which the purpose of the police in interrogating the defendant is not merely to investigate but "to establish the guilt of the accused." *United States v. Massimo,* 432 F.2d 324, 327 (2d Cir.1970) (Friendly, C.J., dissenting), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971); *United States v. Mohabir, supra,* 624 F.2d at 1148–49. When the government crosses the line from the investigatory to the accusatory stage, *United States v. Lilla,* 534 F.Supp. 1247, 1281 (N.D.N.Y.1982), the Sixth Amendment requires that the accused have the assistance of counsel or that the government meet the "heavy burden of proving that any inculpatory statements thus obtained were voluntarily given after a valid waiver of the right to counsel." *Mohabir,* 624 F.2d at 1147 (quoting *United States v. Lord,* 565 F.2d 831, 839 (2d Cir.1977)). That "heavy burden" requires at a minimum some additional indication that the appellant understood what he was surrendering. *Mohabir,* 624 F.2d at 1151; *United States ex rel. Lopez v. Zelker,* 344 F.Supp. 1050, 1054 (S.D.N.Y.1972). Warnings pursuant to *Miranda v. Arizona* do not suffice to meet the "higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached." *United States v. Mohabir,* 624 F.2d at 1147 (quoting *United States v. Massimo,* 432 F.2d at 327 (Friendly, C.J., dissenting)); *Carvey v. LeFevre,* 611 F.2d 19, 22 (2d Cir.1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1858, 64 L.Ed.2d 276 (1980); *United States v. Lord,* 565 F.2d 831, 839 (2d Cir.1977); *United States v. Satterfield,* 558 F.2d 655, 657 (2d Cir.1976).

The sequence of events in this case—the indictment of Brown filed a month before the interrogation, his arrest and incarceration thereafter, and the prospective arraignment and assignment of counsel within an hour of his interrogation—leaves no doubt that Shea did not have an investigative purpose in arranging this pre-arraignment "detour" of Brown for interrogation in the basement of the U.S. Marshal's office, *see United States v. Marrero,* 450 F.2d 373, 379 (2d Cir.1971) (Friendly, C.J., concurring), but was seeking to elicit an uncounseled confession, a practice we have repeatedly disapproved. *Mohabir,* 624 F.2d at 1150; *cf. United States v. Duvall,* 537 F.2d 15, 23–24 (2d Cir.1976), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

The government does not attempt to demonstrate that it has met its heavy burden of showing that Brown waived his Sixth Amendment rights prior to the Shea interview. Rather, it argues that since a statement taken from a suspect in violation of the strictures of *Miranda v. Arizona* is admissible for impeachment if its "trustworthiness . . . satisfies legal standards," *see Harris v. New York,* 401 U.S. at 224, 91 S.Ct. at 645; *Oregon v. Hass,* 420 U.S. 714, 722, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570 (1975), a statement taken in violation of a

A: I read it to him from memory.... I told him that he had a right to remain silent. Anything he says could and would be used against him in a court of law. I told him he had the right to speak to an attorney for advice before I asked him any questions and to have him with him during questioning. I advised Mr. Brown that if he could not afford an attorney, one would be appointed for him by the Government.

I advised him that if he was willing to answer questions now, we could start and at any time he could stop answering until he spoke to an attorney.

Mr. Brown advised that he was willing to answer questions and that he did not want an attorney at this time.

Q: Had you ever told him an attorney was being assigned to him?

A: No.

Q: Did you ever tell him that an attorney would be assigned to him within the hour at the Magistrate's court?

A: No.

Q: Does the FBI have any regulation concerning discussions with defendants in the absence of their attorneys where an attorney has been duly assigned?

A: Once the attorney has been appointed, we do not speak to them until the attorney is present, once the attorney has been appointed, . . . unless the person contacts us and says he would like to speak to us.

. . . .

Q: Do you know at this particular time . . . if the Magistrate had appointed . . . an attorney to represent Mr. Brown?

A: I knew he wasn't arraigned and an attorney is usually appointed at arraignment." (Record at 220–26).

suspect's Sixth Amendment rights should be treated in the same fashion. This argument is rendered untenable by the Supreme Court's decision in *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), which the government ignores,[4] and our decision in *Mohabir, supra.*

In *Portash* the Court held that where the use of a defendant's prior statement (in that case immunized grand jury testimony) would be a clear violation of his Fifth Amendment rights, such testimony could not be used even for impeachment purposes. *Id.* at 459, 99 S.Ct. at 1297. See also *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (involuntary confession may not be used to impeach credibility). Faced in *Portash* with the same argument as that advanced here by the government, i.e., that the Court should follow its earlier rule enunciated in *Harris* and *Hass,* the Court held that although a statement taken in violation of a suspect's *Miranda* rights could be used for impeachment purposes a defendant's compelled statement taken in violation of his Fifth Amendment right against compulsory self-incrimination could not be so used.[5] It reasoned that, while *Miranda* rights could be balanced against the need to deter perjury, when dealing with "the constitutional privilege ... [b]alancing ... is ... impermissible." 440 U.S. at 459, 99 S.Ct. at 1297.

Here we deal with the taking and use of an *indicted* defendant's statement in violation of his Sixth Amendment right to counsel. Balancing this constitutional protection is similarly "impermissible." Indeed, in *Mohabir* we held that even though the defendant, before giving a statement to the prosecutor after the filing of an indictment, had been warned of his Fifth Amendment and *Miranda* rights, this did not qualify as a waiver of his Sixth Amendment right to counsel because waivers of such rights "must be measured by a 'higher standard' than are waivers of Fifth Amendment rights," 624 F.2d at 1146 (quoting from Judge Friendly's dissent in *Massimo, supra*). *A fortiori* the admission of the statement obtained by Agent Shea in violation of Brown's Sixth Amendment right to counsel was clear error. Our holding is limited to the use of a statement taken from an *indicted* defendant in violation of his Sixth Amendment rights. It does not extend to statements taken under other circumstances, such as when the statement is obtained *before* indictment and prior to the attachment of a constitutional right to counsel. See *United States ex rel. Wright v. LaVallee,* 471 F.2d 123, 124 (2d Cir. 1972), *cert. denied,* 414 U.S. 867, 94 S.Ct. 167, 38 L.Ed.2d 87 (1973). Although there was other evidence which, standing alone, might have been sufficient to support a guilty verdict, the jury could have had reasonable doubts about that evidence because of the witness Williams' status as a co-defendant with prior convictions and a history of drug addiction and because Jackson claimed to have seen Brown only once for a few seconds at the scene of the robbery one and a half years before trial and had failed initially to

---

**4.** Although Brown relied heavily on *Portash* in his brief, the government made no mention of this crucial Supreme Court decision in its answering brief.

**5.** The *Miranda* Court recognized that its particular safeguards were not constitutionally compelled, and that the Congress or the states could develop their own means of informing suspects of their rights. 384 U.S. 436 at 467, 86 S.Ct. 1602 at 1624, 16 L.Ed.2d 694. Subsequent Supreme Court decisions have confirmed that the *Miranda* warnings, although constitutionally inspired, are only "a prophylactic means" of safeguarding a suspect's rights. *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976); *Michigan v. Mosley,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975); *Michigan v. Tucker,*

417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974) (*Miranda* warnings were "procedural safeguards ... not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected"). See generally, Saltzburg, *Foreword: The Flow and Ebb of Constitutional Criminal Procedure in the Warren and Burger Courts,* 69 Geo.L.J. 151, 202 n. 361 (1980); Schrock and Welsh, *Reconsidering the Constitutional Common Law,* 91 Harv.L.Rev. 1117, 1166–67 (1978); Monaghan, *Foreword: Constitutional Common Law,* 89 Harv.L.Rev. 1, 20–21 (1975); Cox, *The Role of Congress in Constitutional Determinations,* 40 U.Cin.L.Rev. 199, 251 (1971); Burt, *Miranda and Title II: A Morganatic Marriage,* 1969 S.Ct.Rev. 81, 127–28.

describe Bishop as one of the robbers. Brown's story cannot be labelled incredible beyond a reasonable doubt for it he had been attempting to dunk an imaginary basketball, he would have reached up and over the rim of the plexiglass barrier, leaving his fingerprints just inside the top. Thus Brown's highly self-incriminating statement in all likelihood played a critical role in the jury's decision and its admission was a serious error. Since we are obliged to consider the proof against him in relation to "the gravity of the error[ ]," *Sales v. Harris,* 675 F.2d 532, 540 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982), the seriousness of the error here permits at best only a speculative appraisal of what verdict the jury would have reached without his statement. Under these circumstances, we cannot say that the error in admitting his uncounseled post-indictment statement was harmless beyond a reasonable doubt, which is the stringent standard applied when violations of constitutional rights occur. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Sales v. Harris, supra,* 675 F.2d at 541; *Klein v. Harris,* 667 F.2d 274, 289–91 (2d Cir.1981).

### Use of Brown's Statement to Incriminate Co-Defendant Bishop

The erroneously-admitted Brown statement, although admitted solely for impeachment of Brown, was also used by the government to incriminate his co-defendant Bishop. In cross-examining Brown the prosecutor, after eliciting from Brown that he had been interviewed by Shea, made it apparent to the jury that he was reading from Brown's statement when he converted every sentence of the statement into a question, which began, "Do you remember telling Agent Shea that ..." or "Do you remember advising Agent Shea that ...." For instance, Brown was asked:

"Q. [D]o you remember telling [Agent Shea] ... that you were involved in the robbery of the National Bank of North America ... on October 10, 1979?

"A. No."

In the course of this questioning the Assistant U.S. Attorney asked Brown:

"Q. Do you remember advising agent Shea that *you robbed the bank with an individual by the name of Alexander Bishop?* (Emphasis added).

"A. No.

. . . .

"Q. Do you remember stating to agent Shea *that Bishop ... stayed on the banking floor ...?* (Emphasis added).

Do you remember telling that to agent Shea?

"A. No." (Record at 155–56).

Shortly after his cross-examination of Brown the prosecutor called as a witness Agent Shea, who confirmed the implication in the prosecutor's earlier questioning of Brown to the effect that Bishop had participated in the robbery by giving the following testimony:

"Q. Did he [Brown] indicate whether or not other individuals were involved in this robbery with him?

"A. Yes, he did.

"Q. Did he tell you how many?

"A. Yes.

"Q. *Did he tell you the names of those other individuals?*

"A. *Yes, he did.*" (Emphasis added) (Record at 209–10).

This testimony, viewed in the light of the prosecutor's use of the statement to question Brown about Bishop's participation, would leave little doubt in the average person's mind that Brown had told Shea that Bishop was a participant in the robbery. Cf. *United States v. Danzey,* 594 F.2d 905, 917–18 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979) ("spillover" effect from an improperly redacted inculpatory statement of defendant which substituted the word "blank" for the name of the co-defendant required a new trial).

Thus the effect of the use of Brown's statement, even disregarding the government's violation of *Portash* and *Mohabir,* was improperly to incriminate Bishop. In order to impeach Brown it was unnecessary

to bring Bishop's name into the questioning. The obvious purpose was to use Brown's statement not merely to impeach him but to implicate Bishop, who did not take the witness stand. This tactic violated *Bruton v. United States,* 391 U.S. 123, 127–28, 88 S.Ct. 1620, 1623–24, 20 L.Ed.2d 476 (1968).

■ It is no answer that Brown was available for cross-examination by Bishop whereas the co-defendant in *Bruton* did not take the stand. The introduction of Brown's statement was nevertheless "in a form not subject to cross-examination...." *Bruton, supra,* 391 U.S. at 128, 88 S.Ct. at 1624. Brown had denied any involvement in the crime. In the absence of a common defense any cross-examination of Brown by Bishop would be ineffective and fruitless with respect to the issue of Bishop's participation. This case is therefore clearly distinguishable from *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), relied on by the government. There, predicating its ruling on a "joint trial and a common defense" the Court held that "where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." *Id.* at 629–30, 91 S.Ct. at 1727. The *O'Neil* defendants offered a common alibi as a defense, and both defendants testified concerning the alibi. Here there was no common defense. Indeed, Bishop offered no defense whatsoever and if, as appears to have been the case, the jury disbelieved Brown's denials that he participated in the robbery, his statement had the effect of improperly incriminating Bishop in violation of *Bruton.*[6] Accordingly, we hold that the erroneous reference, on

---

6. Even if the jury had believed Brown's denials, his testimony was not directly favorable to Bishop since Brown made no attempt to exculpate his co-defendant. The rationale of the *O'Neil* decision is thus completely inapplicable. There, as Justice Stewart explained,

> "given a joint trial and a common defense, Runnels' [O'Neil's co-defendant] testimony respecting his alleged out-of-court statement was more favorable to the respondent [O'Neil] than any that cross-examination by counsel could possibly have produced, had Runnels 'affirmed the statement as his.' It would be unrealistic in the extreme in the circumstances here presented to hold that the respondent was denied either the opportunity or the benefit of full and effective cross-examination of Runnels." 402 U.S. at 629, 91 S.Ct. at 1727.

Since the common defense and favorable testimony relied on in *O'Neil* are not present here, we cannot say that Bishop had the opportunity for full and effective cross-examination.

None of our past decisions cited by the dissent involved the unusual circumstances of this case in which a defendant has been denied his constitutional right to a "full and effective" cross-examination, *Nelson v. O'Neil, supra,* 402 U.S. at 626, 91 S.Ct. at 1726 (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970)). On the contrary, in each case the defendant had a full and fair opportunity to test the credibility and accuracy of the statement incriminating him. Thus, we have held that an appellant is not denied his constitutional right to confront a witness against him when a testifying co-defendant's statement is introduced and effective cross-examination was possible because (1) the declarant affirmed the statement as his, although he denied its truthfulness, *United States ex rel. Pugach v. Mancusi,* 441 F.2d 1073, 1075 (2d Cir.), *cert. denied,* 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971); or (2) the witness was available to testify as to the underlying facts, although he did not affirm the statement, *United States v. Insana,* 423 F.2d 1165, 1170 (2d Cir.), *cert. denied,* 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970); *United States v. DeLaMotte,* 434 F.2d 289 (2d Cir.1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971); or (3) the witness gave testimony favorable to the defendant who called the declarant as his own witness, *United States v. Bujese,* 434 F.2d 46, 48 (2d Cir.1970), *cert. denied,* 401 U.S. 978, 91 S.Ct. 1208, 28 L.Ed.2d 328 (1971); *United States v. Ballentine,* 410 F.2d 375, 376–77 (2d Cir.1969), *cert. denied,* 397 U.S. 928, 90 S.Ct. 935, 25 L.Ed.2d 107 (1970); or finally (4) the witness' testimony, in combination with other factors, was neither crucial to the prosecution nor devastating to the defense, *Rado v. State of Connecticut,* 607 F.2d 572, 579, 581 (2d Cir. 1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980) ("Hall was available for effective cross-examination concerning the veracity of his extrajudicial statement").

Accordingly, our prior decisions do not control the circumstances here, where Brown's statement was crucial to the conviction of Bishop against whom the government proffered no physical evidence, relying on the dubious eyewitness testimony of Jackson and of the accomplice Williams, an obviously motivated co-defendant with prior convictions, and therefore

cross-examination of Brown, to his statement implicating Bishop prejudiced Bishop, denying him a fair trial when the co-defendants presented no common defense.

In any event, even if we were to hold that *Bruton* was not violated because Brown was not totally unavailable for cross-examination, the introduction of Brown's out-of-court statement was clearly inadmissible hearsay as to Bishop since it was never authenticated by Brown, the alleged author, but on the contrary denied by him. Nor can Brown's statement be allowed to inculpate Bishop under the guise of impeaching Brown's credibility, since Brown did not testify on Bishop's behalf. The admission of the prejudicial statement was therefore reversible error entitling Bishop to a new trial.[7] Cautionary instructions to the jury to disregard the incriminating statements in determining Bishop's guilt, or that information contained in questions cannot be considered as evidence against an accused, will not suffice to protect a defendant from the impermissible effects of a co-defendant's inculpatory statements. See *Bruton,* 391 U.S. at 135–37, 88 S.Ct. at 1627–28. The jury heard that Brown had incriminated Bishop; the damage could not be undone. Since Brown's statement must in any event be suppressed as violative of *Portash* and *Mohabir* we see no need to require separate retrials on remand.

## The In-Court Identification

Appellants also claim that the in-court identification of them by John Jackson, the assistant bank manager, without a prior line-up or other protective procedure, was impermissibly suggestive, depriving them of their due process right to a fair trial. See *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). However, although Bishop and Brown knew a week prior to trial that there had not been a line-up or selection from a photo spread and that the bank manager was expected to make a positive identification of their clients at trial, they failed to request a line-up or any other protective procedure, such as having the defendants sit in the audience among other individuals of the same general appearance, or having federal employees who fit their description sit near them at the defense table. Rather, they merely objected to the in-court identification and asked to have Jackson precluded from identifying them at trial.

A defendant does not have a constitutional right to a line-up; his request is addressed to the trial court's sound discretion. *United States v. Campbell,* 581 F.2d 22, 28 (2d Cir.1978); *United States v. Estremera,* 531 F.2d 1103, 1111 (2d Cir.), *cert. denied,* 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976); *United States v. Boston,* 508 F.2d 1171, 1176–77 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Ravich,* 421 F.2d 1196, 1203 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). Nor does an in-court identification without a prior line-up or hearing nec-

---

Brown could not, because of his denials that he was involved in the robbery or had made the admissions attributed to him, testify as to the underlying facts of the robbery. See *Rado v. State of Connecticut, supra,* 607 F.2d at 580 n. 6, 581.

**7.** Bishop's counsel preserved his objection to the admissibility of Brown's confession on hearsay grounds by his reference to *Bruton.* The trial court clearly understood Bishop's objection to the hearsay nature of Brown's statement when the court ruled before trial that Brown's statement could be admitted at another "phase" of the trial—i.e., not in the government's case-in-chief—provided Bishop's name was redacted. See note 2, *supra.* Had the government announced in advance of trial its intention to introduce Brown's unredacted confession, Bishop's counsel could have obtained a severance. However, when Bishop's counsel asked the government before trial for any statements of co-defendants, the prosecutor responded that he regarded all such statements as 3500 material and that he would provide them when required to do so just prior to testimony. Hence, only the government knew that if Brown took the stand, there might be prejudicial spill-over into the case against Bishop. Having elected to proceed with a joint trial, the government was obligated to guard against the admission of statements prejudicial to Bishop.

essarily violate a defendant's rights. In the present case, since a line-up conducted by the police, with the presence of defense counsel, promotes the reliability of the subsequent in-court identification, see *Simmons v. United States,* 390 U.S. 377, 386 n. 6, 88 S.Ct. 967, 972 n. 6, 19 L.Ed.2d 1247 (1968); *United States v. Smith,* 473 F.2d 1148, 1150 (D.C.Cir.1972), the prosecutors should in our view have expressly offered a line-up to the defendants in recognition that they may "well consider whether they would not only better protect the rights of the defendant but save themselves much needless argument if, in a case like this, where the defendant was in custody and there was no time pressure, they would have a properly conducted lineup." *United States v. Fernandez,* 456 F.2d 638, 641 n. 1 (2d Cir.1972). Similarly, the trial judge, when he was advised of the identification issue upon calling the case for trial, would have been better advised to direct the government to provide a line-up or an appropriate protective procedure upon the bank manager's being called to identify the defendant at trial. On the other hand, when a defendant is sufficiently aware in advance that identification testimony will be presented at trial and fears irreparable suggestivity, as was the case here, his remedy is to move for a line-up order to assure that the identification witness will first view the suspect with others of like description rather than in the courtroom sitting alone at the defense table. See *United States v. Smith,* 473 F.2d at 1150. Since the government's advance notice to the defendant in the present case was the substantial equivalent of an offer to make available a line-up or protective procedure we cannot say that the defendants' rights were violated or that there was an abuse of discretion by the trial judge.

### Remaining Contentions

Brown's other contentions are meritless. Pursuant to Fed.R.Evid. 615(2), the district court properly allowed Agent Shea, as the case agent, to sit at the prosecution table. *United States v. Perry,* 643 F.2d 38, 53 (2d Cir.), *cert. denied, sub nom. Dewees v. United States,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); see also *United States v. Rollins,* 522 F.2d 160, 167 (2d Cir.1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Zane,* 495 F.2d 683, 694 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). The testimony of an FBI laboratory expert who identified the blood found on the bandit barrier in the bank as type A, which was Brown's type, was relevant and admissible. In any event Brown has not preserved the issue of its admissibility for appeal. See *United States v. Gordon,* 655 F.2d 478, 484 (2d Cir.1981); *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980); *United States v. Knuckles,* 581 F.2d 305, 310 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978).

Finally, Brown's claim that he was denied sufficient time to locate a missing witness must be rejected since he had adequate time before trial—some seven months after his arrest—to locate the witness and assure her presence. In addition, Brown had a weekend between the time when he indicated he might call another witness and the day he requested a delay. Under these circumstances, the trial court properly refused to delay the trial.

The judgments of convictions are reversed with respect to both appellants, and the case is remanded to the district court for retrial.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Although I agree with my colleagues that Agent Shea's questioning of appellant Brown subsequent to Brown's indictment violated his Sixth Amendment right to the assistance of counsel, *see United States v. Henry,* 447 U.S. 264, 269–75, 100 S.Ct. 2183, 2186–89, 65 L.Ed.2d 115 (1980), I disagree with their conclusion concerning the harm that resulted. The explanation for my differing view requires a more extensive discussion of the facts than appears in the majority opinion.

Maxine Williams, who was an admitted participant in the bank robbery and who was identifiable as such in the bank surveillance photos, was questioned by FBI agents at her home on May 21, 1980. This was two days prior to her arrest. At that time, she gave the agents a written statement admitting her participation in the robbery and identifying both Bishop and Brown as participants, although at that time she knew Brown only as "Hughie".

Thereafter, all five of the participants were indicted, and three of them, Williams, Elizabeth Robinson, and Rahmien Sudan, pled guilty to charges flowing from the indictment. Williams agreed to cooperate with the Government, and, despite a Government report that she had been severely beaten by three men because of her anticipated role as a witness, she did testify. She told the jury that the five participants had planned the robbery at Elizabeth Robinson's house on the night preceding the robbery and that they had walked from there to the bank on the day of the robbery. She described the robbery in detail and told the jury how the robbers fled in different directions on foot but ended up at Bishop's house where the loot was divided.

Williams' description of the robbery was corroborated one hundred percent by John Jackson, the assistant bank manager. Mr. Jackson was a retired police officer, who had had special training in observing incidents related to crimes. He testified that he had a clear and unobstructed view of Brown at a distance of twelve feet and for a period of seven seconds during which time Brown was unmasked. Jackson watched Brown as he then pulled down a stocking mask, climbed over the glass bandit-barrier fronting the teller's cage and took the bank's money. When Brown and his cohorts left the bank, Jackson ran to the window to see where they went. He then ran out the back door of the bank to get his car and follow them, saw them again, but lost them when they turned a corner. Jackson's in-court identification of Brown as the robber who climbed over the bandit-barrier and Bishop as the man wielding a gun in the public area of the bank dovetailed exactly with the testimony of Williams.

The testimony of these two witnesses, standing alone, conceivably could have been rejected by the jury. However, no reasonable thinking person could have rejected two undisputed pieces of physical evidence which the Government offered. The first concerned the construction and dimensions of the bandit-barrier over which Brown climbed. The second concerned the existence and location of Brown's fingerprints on that barrier.

The lower part of the barrier is constructed of wood, and is about four feet high. Above this is a horizontal wooden ledge, upon which customer transactions are conducted, and which protrudes about four inches from the wooden surface below it. Above this wooden ledge is a vertical sheet of plexiglass about seven to eight feet in height. Near the top of this glass is another wooden ledge which also protrudes about four inches. Undisputed testimony showed that a print of Brown's thumb was lifted from near the top of the customers' side of the glass barrier and that three of Brown's fingerprints were lifted from the teller's side, about four inches below the top of the barrier. Undisputed testimony also showed that blood was found in the same area as the fingerprints and that it was the same blood type as Brown's.

Brown's explanation that the fingerprints resulted from a demonstration of his leaping ability to his girlfriend two days prior to the robbery was described by Bishop's counsel in a side-bar conference as "incredible".[1] My learned colleagues disagree. They say that, if Brown "had been attempt-

---

1. Brown also testified that he didn't even know Maxine Williams. The possibility that Maxine Williams, for no apparent reason, would name an innocent Brown as her confederate out of more than seven million residents of New York City and that this same innocent Brown just happened to have left his fingerprints high on the plexiglass fronting the teller's cage in the robbed bank during a recently staged jumping exhibition, is so remote that the word "incredible" hardly describes it.

ing to dunk an imaginary basketball, he would have reached up and over the rim of the plexiglass barrier, leaving his fingertips just inside the top." I cannot decide whether my colleagues really believe Brown's fairy tale or whether they believe that jurors are more simple and gullible than they. Without attempting to solve this riddle, I merely point out that (1) assuming a person 5'11" tall could reach over two protruding wooden ledges and "dunk" a basketball, jumping from a standing position in his street clothes, that person would not touch the inside of the basket netting four inches below the hoop as he "dunked", (2) Brown made no claim that he was attempting to "dunk" an imaginary basketball, and (3) Brown's actual testimony, assuming one could bring himself to accept it, was that he "touched the top" of the plexiglass barrier, not that he reached four inches down the opposite side. It is not at all surprising that the "girlfriend" who allegedly saw Brown performing his prodigious athletic feat in a busy urban bank was not produced as a witness. I am convinced that there is only one explanation for the presence of Brown's fingerprints on the inside of the bandit-barrier—Brown climbed over the barrier as Williams and Jackson testified he did. Because I have no doubt whatever that the jury would have convicted Brown without agent Shea's testimony, *Sales v. Harris,* 675 F.2d 532, 541 (2d Cir.1982), I believe that its admission was harmless error.

Appellant Bishop has no standing to assert reversible error on the ground that Brown was deprived of his Sixth Amendment right to counsel. *United States v. Guanti,* 421 F.2d 792, 799 (2d Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 95, 27 L.Ed.2d 64 (1970); *United States v. Van Scoy,* 654 F.2d 257, 266 (3d Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981). *See also United States v. Ballentine,* 410 F.2d 375, 377 n. 2 (2d Cir.1969), *cert. denied,* 397 U.S. 928, 90 S.Ct. 935, 25 L.Ed.2d 107 (1970). My colleagues overturn Bishop's conviction on the ground that he was de-

prived of his constitutional right to confront Brown as a witness. Again, I must disagree.

Maxine Williams testified that four persons, whom she named, participated with her in the bank robbery. Whether or not Brown named the same five participants when he talked with Agent Shea, went squarely to the weight which the jurors would give Brown's alleged confession. A confession which dovetails with the testimony of one of the admitted participants in a crime is much more likely to be given credence than one which omits all details. The prosecutor quite logically, therefore, did not limit his questions to Bishop's status as a participant; he also asked whether Brown had identified Robinson, Black (Sudan) and Williams as his cohorts in the robbery. Although Brown's answer in each instance was "no", my colleagues argue as if it were "yes".

The "well-established rule in our Circuit is that a co-defendant's statements must be 'clearly inculpatory' *standing alone* for *Bruton* to apply." *United States v. Slocum,* 695 F.2d 650, 655–56, (2d Cir.1982), quoting *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978) and *United States v. Wingate,* 520 F.2d 309, 314 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) (emphasis in original). Assuming that Brown's negative answers and Shea's reference to four unidentified persons satisfied this requirement, the fact remains that Brown took the stand, exercised no Fifth Amendment rights, and was subject to full interrogation by Bishop's counsel.

Half-quoting *Bruton v. United States,* 391 U.S. 123, 128, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968), my colleagues state, "the introduction of Brown's statement was 'in a form not subject to cross-examination ....'"[2] I am afraid that my colleagues confuse "cross-examination" with "confrontation".

---

**2.** The ellipsis at the end of the quote substitutes for the significant words "since Evans did not

take the stand." 391 U.S. at 128, 88 S.Ct. at 1624.

The right of cross-examination is not necessarily to be equated with the right of confrontation. When the declarant of the hearsay statements introduced into Peterson's trial took the stand and willingly testified, Peterson's sixth amendment right to confront the witness against him was afforded adequate recognition no matter what the trial testimony of the hearsay declarant turned out to be.

*United States v. Peterson,* 435 F.2d 192, 196 (7th Cir.1970), *cert. denied,* 403 U.S. 907, 91 S.Ct. 2212, 29 L.Ed.2d 683 (1971).

No legal magic attaches to the words "confrontation" and "cross-examination." The only question is: did the defendant, whom the confession implicates, have an opportunity to confront the confessor?

*United States v. Bujese,* 434 F.2d 46, 48 (2d Cir.1970), *cert. denied,* 401 U.S. 978, 91 S.Ct. 1208, 28 L.Ed.2d 328 (1971).

John's choice not to cross-examine Nathaniel regarding the confession does not destroy the reality that Nathaniel was available for that purpose. The right of confrontation is satisfied where there is the opportunity for cross-examination and does not require that the opportunity be exercised.

*Wade v. Yeager,* 415 F.2d 570, 572 (3d Cir.), *cert. denied,* 396 U.S. 974, 90 S.Ct. 466, 24 L.Ed.2d 443 (1969).

There may be occasions when the testimony of a witness on direct is sufficiently favorable that cross-examination becomes unnecessary. That such testimony comes voluntarily "instead of being wrung from him on cross-examination shows only that cross-examination was unnecessary and not that it was unavailable." *Id.* at 573. A

"witness, favorable to the defendant, should be more than willing to give the usual suggested explanations for the inaccuracy of his prior statement, such as faulty perception or undue haste in recounting the event." *California v. Green,* 399 U.S. 149, 160, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *see United States v. Rogers,* 549 F.2d 490, 501 n. 12 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Accordingly, when the defendant's failure to examine his co-defendant is the "product of his own inaction", he has not been deprived of his constitutional right of confrontation. *Trigg v. United States,* 430 F.2d 372, 375 (7th Cir.), *cert. denied,* 400 U.S. 966, 91 S.Ct. 379, 27 L.Ed.2d 387 (1970).[3]

The majority opinion, which engrafts on this universally accepted interpretation of the confrontation clause the requirement that the co-defendants must be presenting a common defense, flies squarely in the face of numerous holdings of this court and misinterprets the Supreme Court's holding in *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). In *Rado v. State of Connecticut,* 607 F.2d 572 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980), the defendant was accused of masterminding a robbery and supplying his cohorts with walkie-talkies and a gun. One of the robbers, who previously had pleaded guilty, was called by the prosecution and admitted during cross-examination as a hostile witness that he had implicated Rado at his own plea hearing. Although the witness and Rado were not asserting a common defense, we held that Rado was not deprived of his right of confrontation. *Id.* at 580. Among the many

---

**3.** In reversing Bishop's conviction, my colleagues assert that Bishop was denied the opportunity for full and effective cross-examination. This assertion is without basis in the facts. Brown's alleged confession to Agent Shea had absolutely no meaning or probative force if Brown himself was innocent. Bishop had ample opportunity on cross-examination to fully develop Brown's alleged innocence. Bishop had ample opportunity to attack the Government's proof that Brown met with him on the night before the robbery, that they walked to the bank together, that they entered the bank together, disarmed the guard, pushed him to the floor, and announced a holdup, and that they met after the robbery to divide the loot. Bishop also had ample opportunity to fully explore the facts surrounding the alleged confession. He could have inquired whether there were promises, threats, intimidation, or coercion, whether Agent Shea had tried to secure a written statement, *etc.* Instead, Bishop's counsel gambled by not asking a single question and has now hit the jackpot.

cases cited in support of that holding was *Nelson v. O'Neil. See* 607 F.2d at 580 n. 6.

In *United States ex rel. Pugach v. Mancusi,* 441 F.2d 1073 (2d Cir.), *cert. denied,* 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971), Pugach was alleged to have hired his co-defendant to maim his former girlfriend by hurling lye in her face. Evidence was admitted that the co-defendant, who took the stand, had previously confessed and implicated Pugach. Quoting *United States v. Bujese, supra,* 434 F.2d at 48, we held there was no violation of the defendant's right of confrontation. 441 F.2d at 1075.

In *United States v. DeLaMotte,* 434 F.2d 289 (2d Cir.1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971), the same ruling was made where the defendants had high-jacked a truck. *Id.* at 293–94. In *United States v. Insana,* 423 F.2d 1165 (2d Cir.), *cert. denied,* 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970), where the defendants were convicted of mail fraud, we rejected appellant's claim that he had been denied his Sixth Amendment right of confrontation because cross-examination of his impeached co-defendant would have been "ineffective" and "fruitless". *Id.* at 1168. In *United States ex rel. Smith v. Reincke,* 354 F.2d 418 (2d Cir.1965), *cert. denied,* 384 U.S. 993, 86 S.Ct. 1896, 16 L.Ed.2d 1010 (1966), the impeached witness and the defendant murdered a watchman. We said there, "Counsel for petitioner at trial chose not to cross-examine; it cannot be said that he was unable to do so." *Id.* at 421. In *United States v. Ballentine, supra,* 410 F.2d 375, the defendant who was charged with a narcotics violation called as a witness his co-defendant who had previously pleaded guilty. We rejected defendant's contention that the prosecutor was precluded from impeaching this witness because the defendant was unable to cross-examine him. *Id.* at 376. In *United States v. Bujese, supra,* 434 F.2d 46, the co-defendants robbed a bank together.

In none of these cases, were the defendant and the impeached witness asserting a common defense. Moreover, there was no common defense in *California v. Green, su-*

*pra,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, where the impeached witness was a sixteen-year-old minor who had been arrested for selling marijuana and had named the defendant as his supplier. There, the Court flatly stated that "none of [its] decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial." *Id.* at 161, 90 S.Ct. at 1936.

The question presented in *Nelson v. O'Neil* was "whether cross-examination can be full and effective where the declarant is present at the trial, takes the witness stand, testifies fully as to his activities during the period described in his alleged out-of-court statement, but denies that he made the statement and claims that its substance is false." 402 U.S. at 627, 91 S.Ct. at 1726. The Ninth Circuit, 422 F.2d 319, had held that, when the Government sought to impeach a co-defendant who denied having made the statement inculpating the defendant, the defendant was denied effective cross-examination of the witness. Justice Stewart, writing for the Court majority, gave this argument short shrift, stating, "Of course, a witness *can* be cross-examined concerning a statement not 'affirmed' by him ...." (Emphasis in original.) 402 U.S. at 627, 91 S.Ct. at 1726. Justice Stewart continued:

> The short of the matter is that, given a joint trial and a common defense, Runnels' testimony respecting his alleged out-of-court statement was more favorable to the respondent than any that cross-examination by counsel could possibly have produced, had Runnels "affirmed the statement as his."

*Id.* at 629, 91 S.Ct. at 1727.

This was not a holding. It was simply a statement of obvious fact. The Court's actual holding was:

> We conclude that where a co-defendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defend-

ant has been denied no rights protected by the Sixth and Fourteenth Amendments.

*Id.* at 629–30, 91 S.Ct. at 1727–28.

A fair reading of *Nelson v. O'Neil* simply does not support the majority's holding that "the erroneous reference, on cross-examination of Brown, to his statement implicating Bishop prejudiced Bishop, denying him a fair trial when the co-defendants presented no common defense." *See, e.g., Rado v. State of Connecticut, supra,* 607 F.2d at 580 n. 6; *United States v. Maddox,* 492 F.2d 104, 107–08 (5th Cir.), *cert. denied,* 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974).

The majority's final argument, that the admission of Brown's out-of-court statement was hearsay as to Bishop, was not made in the trial court or in Bishop's brief on appeal, and it should not now be used as a basis for reversal. *United States v. Marquez,* 424 F.2d 236, 239 (2d Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970). Whether the admission of a statement violates evidentiary rules against hearsay is a "wholly separate question" from the Sixth Amendment right of confrontation. *California v. Green, supra,* 399 U.S. at 163 n. 15, 90 S.Ct. at 1937 n. 15; 5 *Wigmore on Evidence,* § 1397 at 184. In any event, the majority's argument that Brown's out-of-court statement had incriminated Bishop is clearly wrong. Brown specifically denied that he had inculpated Bishop in his conversation with Shea, and Shea did not mention Bishop's name when he testified about Brown's confession.

Judge Neaher very carefully instructed the jury that anything that counsel may have said in questions or in their final summations was not to be substituted for the jury's recollection of the evidence and that the jury must unhesitatingly reject any statement of fact which either the court or counsel may have made that did not accord with the jury's recollection. Under the circumstances, I see no basis for the majority's statement that "the jury heard that Brown had incriminated Bishop". Reversal on that ground is unwarranted. *United States v. Morgan,* 562 F.2d 1001, 1003–04 (5th Cir.

1977), *cert. denied,* 435 U.S. 1050, 98 S.Ct. 899, 54 L.Ed.2d 802 (1978).

With all due respect to my distinguished colleagues, I am afraid that their decision has been influenced unduly by a desire to teach the United States Attorney's Office and the FBI a lesson. Because I believe that the public pays too high a price for a lesson that rewards perjury, makes bad law, and opens the jailhouse doors for felons, convicted and clearly guilty of armed robbery, I dissent. I would affirm the section 2113(d) convictions into which the section 2113(a) convictions merged.